IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| STACY FRANZ, | ) | |
| | ) | |
| Plaintiff, | ) | 8:05CV178 |
| | ) | |
| v. | ) | |
| | ) | |
| JOANNE BARNHART, Commissioner | ) | MEMORANDUM AND ORDER |
| of Social Security, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

In this social security appeal, the plaintiff, Stacy Franz, ("Franz") contends that a decision of the defendant, the Commissioner of the Social Security Administration, to deny him disability insurance benefits is contrary to law and not supported by substantial evidence.  After having carefully reviewed the record, I find that the Commissioner's decision should be reversed and the cause remanded for further administrative proceedings.

I.  PROCEDURAL BACKGROUND

Franz applied for Title II benefits on January 23, 2003, alleging he became disabled on July 1, 1997, due to major depression, degenerative joint disease, degenerative disc disease, hypertension, arthritis, and agoraphobia.  He claims these illnesses and conditions caused difficulty in concentrating, lack of energy, trouble with sitting and standing for more than a short period of time, and that he "rarely leave[s] the house."  AR 51-53, 57.  His application was denied initially on March 31, 2003, and on reconsideration on May 20, 2003 (AR 31-34, 36-39).

Franz filed a request for a hearing on May 29, 2003 (AR 40). Administrative Law Judge James M. Mitchell of Stockton, California conducted a hearing in Omaha on April 28, 2004, and testimony was received from Franz and a vocational expert who appeared at the ALJ's request (AR 43-50, 312-349).  At the hearing, Franz, through his attorney, amended the date of onset to January 1, 1999 and stipulated that the date last insured was in June of 2000 (AR 315).

## II.   THE RECORD AND PROCEEDINGS BEFORE THE ALJ

Franz is a veteran who was born in 1954.  He joined the Air Force in June of 1972 and retired in July of 1993, having attained the rank of Master Sergeant (E7).  At the time of discharge, Franz was the Superintendent of Imagery, and interpreted images from intelligence sources for military use. AR 84, 87, 316, 320, 322.  In September 1993, he began working as a "picker/packer," one who retrieves ordered products from the factory warehouse or prepares them for shipment, and he continued in that position until December 1994.  AR 84, 86, 319.  From September through December 2000, he was a retail clerk at a video store, but this job was not deemed substantial gainful employment.  AR 84-85, 75.

Franz received his medical care through the Department of Veterans Affairs (VA).  As early as September 1993, VA examining physicians diagnosed Franz as having minor facet degenerative changes in his low back and determined Franz was suffering from major depression with associated headaches.  Air Force retirement and a recent divorce were identified as moderate

2

and severe psychosocial stressors in Franz' life.  His Global
Assessment of Functioning ("GAF") was 70 (AR 181-83).[1]

Franz was reevaluated by the VA in January of 1996.  He was
attending night school and working toward an associates degree in
computer programming, maintaining a 3.5 grade point average.  He
reportedly had few friends and had withdrawn from his family.
The VA examining physician diagnosed Franz as having major
depression, chronic headaches, and low back pain.  He opined that
although Franz was able to meet the fairly limited demands of
night school, it would be very difficult for him to obtain and
maintain a competitive job.  Psychiatric treatment was
recommended.  Franz received a VA disability rating of 30% for
neurosis, 10% related to a condition of the skeletal system, and
10% for degenerative arthritis.  AR 171-175.

Another VA mental health evaluation was conducted in January
1999.  At this time Franz reported he was depressed and isolating
more, had disrupted sleep and eating patterns, and stated he
"gets very nervous if he goes more than an hour or two away from
his home."  He was still working on his degree and had
three classes remaining.  He was not under psychiatric care and
had not been since the January 1996 evaluation.  At the time of
his examination, he was unkempt, untidy, and had strong body

---

[1]Global assessment of functioning (GAF) is the clinician's
judgment of the individual's overall level of functioning, not
including impairments due to physical or environmental
limitations.  GAF scores in the 61 to 70 range indicate "mild
symptoms (e.g. depressed mood and mild insomnia) OR some
difficulty in social, occupational, or school functioning (e.g.
occasional truancy, or theft within the household), but generally
functioning pretty well, has some meaningful interpersonal
relationships."  See American Psychiatric Association, Diagnostic
and Statistical Manual of Mental Disorders, at 12 (3d ed.
1987)("DSM-III-R")(the revision in effect when the GAF of 70 was
diagnosed).  See also Diagnostic and Statistical Manual of Mental
Disorders (DSM-IV), 32 (4th ed. 1994) and DSM-IV-TR, 34 (4th ed.
2000)(the current version), both of which are identical in
pertinent part to the 1987 edition.

odor.  He denied using street drugs but stated he drinks six or
seven beers about every three weeks.  He stated his mother has a
history of depression.  AR 167-169.

The 1999 VA examining physician diagnosed Franz as having
major depression and his GAF had decreased to 45.[2]  However, his
memory was intact, his IQ was average or above average, he was
able to handle his own finances, and although his insight was
poor, his judgment was good.  As compared to the 1996 rating, the
1999 VA disability rating was unchanged.  Franz continued to
receive a rating of 30% for neurosis, 10% for a condition of the
skeletal system, and 10% for degenerative arthritis.  AR 167-169.

On June 20, 2001 Frantz' mental status was reevaluated by
the VA.  The examining physician found that "[s]ince his last
examination, his condition has remained essentially the same
possibly getting somewhat worse in the sense of social
withdrawal."  AR 160.  He had completed his associates degree in
computer programming in 1999 and had started a second degree in
computer networking, but he dropped out of school for lack of
motivation.  His sleep cycle was disrupted; he spent his time
playing computer games, reading, and doing puzzles until 3:00
a.m., waking up at 6:00 a.m., and then not getting up until 10:00
a.m.  AR 161, 323, 325-26.  The VA examining physician records
state, "He is not working.  He lives by himself in an apartment
and seldom goes out except to get food."  AR 161, 327.  Franz
explained that the "only safe place is home," and he only goes to
the grocery store.  AR 164.  Franz reported that he used to

_____

[2]GAF scores in the 41 to 50 range are characterized by
"serious symptoms (e.g., suicidal ideation, severe obsessional
rituals, frequent shoplifting) or any serious impairment in
social, occupational, or school functioning (e.g., no friends,
unable to keep a job)."  Diagnostic and Statistical Manual of
Mental Disorders (DSM-IV), 32 (4th ed. 1994)(the revision in
effect when the GAF of 45 was diagnosed).  See also DSM-III-R at
12, and DSM-IV-TR at 34, both of which are identical in pertinent
part to the 1994 edition.

4

drink, but now has only about one shot a month.  He had not
received psychiatric treatment and was not taking medications.

The 2001 VA diagnosis was "Major depression, continuous."
"Global assessment of function for major depression is 50
indicating serious ongoing symptomatology including disabling
indecision and ruminations.  The depressive symptomatology is
seriously impairing his social activities and have been a
significant impediment in his occupational attempts.  He did drop
out of school indicating significant dysfunctioning in school."
AR 161.  In summary, "[h]is symptomatology has remained constant
with significant impairment in social, occupational, and
educational functioning related to his depressive symptomatology
. . . .  He is living a very restricted and isolated life style."
AR 162 (emphasis added).  The 2001 disability impairment rating
was 50% for major depressive disorder, 10% for a condition of the
skeletal system, and 10% for degenerative arthritis.  AR 165.
Entitlement to individual unemployability was granted by the VA
effective June 20, 2001.  Based on its mental health evaluations
of Franz, the VA concluded that Franz' "service connected major
depression interferes with his ability to obtain and sustain
substantially gainful occupation. . . ."  AR 310.

By March of 2003, Franz was diagnosed with major depression
and a GAF of 40-45.[3]  AR 153-155.  His symptoms remained
essentially consistent with those reported in 2001.  The March
2003 intake interview states Franz was seen in the fall of 2001
by Dr. Ahmad, was prescribed Effexor, which caused sexual
dysfunction, and then Wellbutrin, which he did not take.  Records
of Franz' fall 2001 treatment by Dr. Ahmad, and any medications
prescribed are not included in the record nor mentioned by the
ALJ.

---

[3]See footnote 2.

Wellbutrin was prescribed in March 2003, (AR 155), and Franz began receiving regular mental health care with medications prescribed, adjusted, and changed in an attempt to adequately treat his ongoing depression, anxiety, and withdrawal. See AR 123-24, 128-29, 139-140, 142, 145, 152-55, 237, 248, 258-59, 269-70, 304-05, 330. Nevertheless, as of the date of the last mental health visit in the record, March 31, 2004, Franz had a "[c]ontinuing ongoing depressive disorder with unclear treatment response from . . . antidepressant medications." AR 305. He continued to report that "little has changed in his life," and he "still predominantly stays in [his] apartment, isolates himself." AR 304.

The foregoing description of Franz' medical evaluations and care coincides with the January 2003 supplemental information provided by John Gibbons, Franz' friend of fifteen years. Mr. Gibbons stated that Franz does not "clean up as well now as he did a few years ago (about 7 yrs)." AR 77. Mr. Gibbons states he used to see Franz in the evenings, but now Franz is "very withdrawn," "does not go out much at all to see friends," does not interact with people in social activities, and is very easily angered. AR 76-77. He seems "very depressed and with drawn [sic]. Does not want to go out or do things." AR 78.

At the outset of Franz' hearing before the ALJ, Franz' counsel argued that the June 30, 2001 VA determination of unemployability should relate back to a date prior to the date last insured. AR 315. However, despite the progressive nature of Franz' mental impairments as reflected in the medical records, the ALJ did not consult a medical advisor to determine whether those impairments reached the level of a disability at any time prior to the date last insured.

The ALJ's questioning of Franz consisted of a checklist of questions which focused on his physical condition. After acknowledging that Franz' job as an Air Force "image interpreter"

6

was not available in the private sector, the ALJ continued as
follows:

Q.   You picked out items, warehouse work.  Why can't you
     return to this type of work?

A.   Well –

Q.   Where do you have pain?

A.   Basically I can't stand for six hours a day anymore.

Q.   Why?

A.   Overweight and –

Q.   Well, where do you have pain?

A.   Oh, where do I have pain?

Q.   Yes.

A.   Well, back, knees.

Q.   Both knees?

A.   Yes.

Q.   Anyplace else?

A.   Hip.

Q.   Which?

A.   Right.

Q.   Anyplace else?

A.   Feet.

Q.   Which?

A.   Both.

The ALJ's questioning did not address whether Franz' ability to
perform a warehouse job was affected by the mental health
problems outlined in his VA records dating back to 1993.

Throughout the remainder of the hearing, the ALJ's
questioning further explored Franz' physical limitations.
Responding again to the ALJ's specific questions, Franz testified
that he can stand an hour and sit a couple of hours without pain;
can walk a quarter mile; can put on his own socks and shoes; can
climb the fifteen steps into his apartment; can reach out and
place his hands on the table, touch the side of the table, and
reach overhead; and can pickup and hold small items such as pins
and pencils, feel hot and cold on his hands, and write.  AR 331-
32.  The exchange continued thereafter as follows:

> Q.   Okay.  Do you have any physical problems talking?
>
> A.   I don't believe so.
>
> Q.   Well, you don't have lockjaw.
>
> A.   No.
>
> Q.   You've got all your teeth and your tongue is still
>      there.  Right?
>
> A.   Yes, sir.

In response to the ALJ's continuing checklist of questions,
Franz acknowledged he could turn his head from left to right and
look down his shoulders; could use the phone, although he did so
only once every two weeks; used glasses to read; and has
emphysema but does not need to use an inhaler.  AR 333-34.  The
ALJ asked a summary question as follows:

> Q.   What's you main complaint?  Where do you hurt?
>
> A.   Well, do you mean physically hurt or –
>
> Q.   Yeah.
>
> A.   The main complaint would be my back.
>
> Q.   Okay.  Anyplace else?
>
> A.   Knees.

Q.   Both?

A.   Yes, sir.

Q.   Anyplace else?

A.   Right hip.

Q.   anyplace else?

A.   If I stand too long . . . my feet will begin to hurt.

Franz acknowledged that while the pain was a constant achy pain which seemed worse in the morning, on an average day the pain was mild.  The pain was exacerbated by sitting and alleviated by lying down.  AR 335.  He stated he was five feet nine inches tall and weighed 290 pounds.  AR 335-36.

After the ALJ had finished his list of questions related to Franz' physical problems, the following questioning occurred:

Q.   Is there anything else about your condition that you feel like I should know about that I've not asked about up to this point?

A.   Well, you haven't asked really very much about, you just dealt on the physical aspects.

Q.   Primarily, yes, because I mostly rely upon the medical records because I'm not a psychiatrist and you can tell me you're sitting there hearing voices from God right now, and I can't show one way or the other whether or not you are or you're [sic] aren't.  So obviously your attorney has already made a record of the fact that the primary disability that you are relying on is apparently mental.  Is that right?

A.   Yes, sir.

Q.   Okay.  Do you want to tell me about, without using diagnostic terms such as depression, anxiety and panic attacks, what you feel?

Franz conceded that he had explained everything to his mental health providers but added:

9

> A.    Basically, you know, there's a lot going on, I think, but I just don't feel comfortable anywhere.
>
> . . . .
>
> Q.    You don't like to be around people?
>
> A.    Right.
>
> . . . .
>
> Q.    What did you do to avoid people?
>
> A.    Well, I don't go anywhere basically, and what I do is bee line there and bee line back. . . .  I go there, do what I have to do and, you know, basically the only time I go out is to get food, and that usually takes about anywhere from 20 minutes to a half-an-hour.

AR 337-38.  Nowhere in Franz' medical records, including those specifically addressing the time period between January 1999 and June 30, 2000, does a medical doctor or mental health provider state any opinion concerning how much time per day Franz can mentally tolerate being outside the confines of his home.

In response to his attorney's questions, Franz explained that when he leaves his house, he sweats profusely, gets very angry, feels he needs to get home, and experiences road rage during the five-minute trip home.  AR 339-40.  In followup, the ALJ confirmed Franz retired out of Offutt Air Force Base, and inexplicably asked if Franz knew whether Offutt had both an Officer's Club and an NCO club, and for driving directions to get there.  AR 340-41.

The vocational expert testified that based on Franz' medical records and testimony, the physical demands of Franz' past occupation as an "order filler" were characterized as light and the position was considered semi-skilled.  AR 342.  The ALJ then began proposing serial hypothetical questions as follows.

The ALJ's first hypothetical question asked the vocational expert to assume:

10

- Franz was 49 years old, had a high school education and two years of college;

- had the work experience described in his testimony; and

- could "lift, push, pull 20 occasionally, ten frequently, walk/stand frequently, sit stoop or bend occasionally."

AR 342.  Assuming these restrictions, the vocational expert testified that Franz could return to his past work as an order filler, had transferrable skills to perform the job of an inventory clerk, cashier, assembler, and hand packager, and that thousands of such jobs existed in the region including Iowa, Nebraska, Missouri, and Kansas.  AR 342-43.

The ALJ asked the expert to add the following limitations:

- limited attention, concentration, understanding and memory, vision diminished but corrected;

- hearing, fine and gross manipulative skills intact and unlimited;

- slight limitations in the ability to perform simple routine tasks;

- no environmental restrictions;

- ability to have unlimited contact with the public under occasional supervision; and

- physical pain at slight to moderate levels.

Assuming these additional limitations, the vocational expert stated Franz could return to his past relevant work as an order filler, with no erosion in the number of jobs.

The ALJ added the following restriction:
- limited in contact with the public to six hours or less per shift.

The vocational expert testified that even with this restriction, Franz could return to his past relevant work as an order filler with a twenty percent erosion in the number of jobs.  AR 343.

The ALJ added the following restrictions:
- moderately limited attention and concentration; and
- slightly limited understanding and memory.

According to the testifying vocational expert, with these restrictions added, Franz's could return to his past relevant work as an order filler with twenty-five percent job erosion.  AR 344.

Finally, as to Franz' past relevant work, the ALJ added the following restrictions:

- moderate limitations in understanding, memory, attention, and concentration; and

- a moderate limitation in the ability to do SRT.

The vocational expert again testified that with these additional restrictions, Franz could return to his past relevant work as an order filler with a twenty-five percent job erosion. AR 344.

The ALJ then asked the vocational expert to assume Franz could not return to his past relevant work.  The ALJ told the expert assume Franz could perform only sedentary work, and then asked the same series of hypothetical questions previously posed with respect to returning to his past relevant work.  Again, according to the expert, there were thousands of assembler, cashier, hand packager, and interviewer jobs in the sedentary category, with approximately a twenty percent erosion of that market due to the additional restrictions added in the ALJ's serial hypothetical questions.

On questioning by Franz's attorney, the vocational expert was asked to assume Franz suffered from disrupted sleep, lack of energy, motivation, and interest; was withdrawn and isolated, leaving his apartment only every several days, and when he does

so, sweats and needs to return home within twenty minutes; and
that Franz becomes easily frustrated with routine tasks such as
driving in traffic.  With these additional restrictions, the
vocational expert stated Franz could not return to either his
past work or to any other work in the national economy.

Upon re-examination by the ALJ, the vocational expert
testified that if Franz were limited to three hours of public
contact per day, he could return to his past relevant work with
twenty-five percent job erosion.  In response to a question by
Franz' counsel, the expert stated that if limited to one hour of
public contact per day, Franz could return to work because "his
past work as an order filler did not involve contact with the
general public, only with coworkers."  AR 348.


III.   THE ALJ'S DECISION.

On September 21, 2004 the ALJ issued a decision which found
that Franz was not entitled to disability insurance benefits.  AR
21-26.  In reaching this decision, the ALJ evaluated Franz'
claims through all five steps of the sequential analysis
prescribed by 20 C.F.R. §§ 404.1520 and 416.920, and made the
following findings:

1.    The claimant meets the nondisability requirements for a
      period of disability and Disability Insurance Benefits
      . . . and is insured for benefits through June 30,
      2000;

2.    The claimant has not engaged in substantial gainful
      activity since the alleged onset of disability;

3.    The claimant's degenerative disc disease of the lumbar
      spine and depression are considered "severe" based on
      the requirements in the Regulations (20 CFR §§ 404.1520
      (c));

4.    These medically determinable impairments do not meet or
      medically equal one of the listed impairments in
      Appendix 1, Subpart P, Regulation No. 4;

13

5. The claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision;

6. The claimant has the residual functional capacity to perform light work with limited contact with the public and occasional supervision;

7. The claimant's past relevant work as an order filler did not require the performance of work-related activities precluded by his residual functional capacity (20 CFR §§ 404.1565);

8. The claimant's medically determinable degenerative disc disease of the lumbar spine and depression do not prevent the claimant from performing past relevant work;

9. The claimant was not under a "disability," as defined in the Social Security Act, at any time on or before "June 1, 2000,[4]" the date he was last insured for Disability Insurance Benefits.

AR 25-26.

Franz' request for a review of the ALJ's decision was denied by the Appeals Council on March 16, 2005 (AR 2, 6-7). His complaint was filed in this court on April 21, 2005. The matter is now fully briefed and ripe for decision.

IV.   ANALYSIS

Franz raises several issues in arguing for remand of this case. He claims: 1) while the ALJ acknowledged the claimant received a disability rating from the Veteran's Administration, he failed to discuss this rating or give it proper weight; 2) the ALJ failed to obtain the assistance of a medical adviser to determine the severity of Franz' depression prior to his date

---

[4]The court presumes this is a typographical error. The body of the ALJ's decision, (AR at 21), and paragraph 1 of the his findings both state June 30, 2000 was the date last insured.

last insured; 3) the ALJ failed to properly evaluate Franz'
testimony regarding subjective impairments; 4) the ALJ concluded
that Franz can perform light work with occasional supervision and
contact with the public restricted to six hours or less per
shift, but this RFC finding was not supported by any medical
evidence; 5) the ALJ failed to consider Franz' testimony
concerning his mental symptoms; and 6) the ALJ's hypothetical
questions posed to the vocational rehabilitation expert did not
include all impairments supported by substantial evidence in the
record.

Section 205(g) of the Social Security Act, 42 U.S.C. §
405(g), provides for judicial review of a "final decision" of the
Commissioner under Title II, which in this case is the ALJ's
decision.  A denial of benefits by the Commissioner is reviewed
to determine whether the denial is supported by substantial
evidence on the record as a whole.  Hogan v. Apfel, 239 F.3d 958,
960 (8th Cir. 2001).  "Substantial evidence is relevant evidence
that a reasonable mind would accept as adequate to support the
Commissioner's conclusion." Maresh v. Barnhart, 431 F.3d 1073,
1074 (8th Cir. 2005); Goff v. Barnhart, 421 F.3d 785, 789 (8th
Cir. 2004)(quoting Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir.
2000)).  Evidence that both supports and detracts from the
Commissioner's decision must be considered, but the decision may
not be reversed merely because substantial evidence supports a
contrary outcome.  Id.  See also  Moad v. Massanari, 260 F.3d
887, 890 (8th Cir. 2001).  This court must also review the
decision of the Commissioner to decide whether the proper legal
standard was applied in reaching the result.  Smith v. Sullivan,
982 F.2d 308, 311 (8th Cir. 1992). Issues of law are reviewed de
novo.  Olson v. Apfel, 170 F.3d 820, 822 (8th Cir. 1999); Boock
v. Shalala, 48 F.3d 348, 351 n.2 (8th Cir. 1995); Smith, 982 F.2d
at 311.

A.   <u>Failure to Properly Consider VA Evaluations and</u>
<u>Ratings</u>.

Franz claims the ALJ erred in failing to consider and give
weight to the VA's 2001 disability rating.  He argues that he was
rated at fifty percent for his service-connected disability as of
January 9, 1999, this rating was increased to seventy percent as
of June 21, 2001, and Franz was awarded individual
unemployability.  The Commissioner argues:  "[T]he ALJ
specifically noted the June 2001 VA rating;" "referenced the
prior rating in 1999 of 50% service connected disability for
depression;" a VA disability determination is not binding on the
Commissioner; and "[t]he ALJ considered the VA ratings, but was
not bound by those decisions."  Filing 18 (government's brief) at
7-8.

The ALJ did mention both the 1999 and the 2001 VA rating
evaluations, but stated the 2001 disability rating by the VA was
"not relevant to this review" because it occurred after Franz'
date last insured, that being June 30, 2000.  AR 22.  The ALJ's
decision states:

> The evidence discussed after the Date Last Insured of
> June 30, 2000 is not relevant to the disability finding
> in this case since no finding could be made on the pre-
> June 30, 2000 evidence.  Indeed, that evidence is
> rather sparse.  Moreover, since the VA claim is based
> on diagnosis alone and since that is not the standard
> for Title II and Title XVI benefits under the Social
> Security Act, the VA pension determination is not
> solely dispositive of the issue of disability under the
> law and regulations of the Social Security Act.

AR 23.  The ALJ's written decision clarifies that he did not
consider the 2001 VA rating for two reasons:  1) he concluded
that evidence of Franz' medical condition after the date last
insured was irrelevant; and 2) VA ratings are not binding on the
Commissioner.

1.   <u>The Relevant Record</u>.

The mere fact that a mental or physical examination was made following the expiration of insured status does not automatically make the examination irrelevant.  <u>Parsons v. Heckler</u>, 739 F.2d 1334 (8th Cir. 1984).  In <u>Parsons</u>, the claimant had severe mental problems with a date last insured of June 30, 1981.  The Commissioner argued that psychiatric evaluations made after June 30, 1981 were irrelevant and could not be considered in determining whether Parsons was disabled within the insured period.  The <u>Parsons</u> court disagreed, and held:

> In this case, there are strong correlations between the three most extensive psychological evaluations of Parsons, those of September 19, 1980, December 14, 1981 and May 3, 1982.  While the conclusions of these evaluations are not identical, they all describe an individual with serious mental problems.  All these evaluations must be considered in order to get a clear understanding of Parsons' mental condition as of June 30, 1981.

<u>Parsons</u>, 739 F.2d at 1340 (citing <u>Mann v. Richardson</u>, 323 F. Supp. 175, 177-78 (S.D.N.Y. 1971) and <u>DeNafo v. Gardner</u>, 272 F.Supp. 44, 46 (D.C.N.J. 1967)).  See also <u>Selk v. Barnhart</u>, 234 F. Supp. 2d 1006 (S.D. Iowa 2002)(holding medical, psychological, and psychiatric evaluations rendered outside the period in which claimant was last insured for benefits are relevant to the extent they reflect upon the claimant's condition as of date last insured); <u>Meinders v. Barnhart</u>, 195 F. Supp. 2d 1136 (S.D. Iowa 2002)(subsequent medical, psychological, and psychiatric evaluations are relevant in determining whether the claimant had severe impairment at time she was insured, and to the extent they reflect upon the claimant's condition as of the date last insured, and they must be considered).

The records in this case reflect Franz was diagnosed with depression in 1993, and while this diagnosis never changed, his

mental state related to that diagnosis continued to deteriorate
from 1993 until long after the date last insured.  For
substantially the same reasons described in Parsons, I conclude
the ALJ erred in concluding the 2001 VA rating evaluation, and
all medical records dated after the date last insured, were
irrelevant to determining if Franz was disabled and the extent of
his impairments and restrictions as of June 30, 2000.  The
records in this case reflect that VA physicians have concluded
Franz has serious mental problems; the 2001 mental evaluation
states Franz' "serious ongoing symptomatology," (AR 161),
"remained constant," (AR 162), and as of March 2004, his
"[c]ontinuing ongoing depressive disorder" created, according to
his physician, significant limitations on Franz' ability to work
which did not appear to be responding to medication.  AR 305.

   All Franz' evaluations and records, both those pre-dating
and post-dating his date last insured, must be considered in
order to get a clear understanding of Franz' mental condition and
accompanying functional impairments.  For this reasons, this case
must be remanded to the ALJ for review of the entire relevant
record and re-evaluation of Franz' claimed disability.  As
explained in Social Security Ruling 83-15, Evaluation of Chronic
Mental Impairments:

> The adjudicator should recognize that the individual's
> level of functioning may vary considerably over a
> period of time.  The level of functioning at any
> specific point in time may seem relatively efficient or
> may be very poor.  Proper evaluation of the impairment
> must take these variations into account to arrive at a
> determination of the severity of the individual's
> impairment over time.  Thus, it is vital to obtain the
> necessary medical evidence from treating sources and to
> obtain information about the activities of daily living
> over a sufficiently long period of time prior to the
> date of adjudication in order to establish the
> individual's baseline impairment severity.  Even clinic
> records with brief entries are often valuable, when
> combined with other evidence, in determining a baseline
> level of function.

SSR 83-15.  Before concluding Franz is not disabled, the ALJ may also need to call upon a qualified psychologist or a psychiatrist to perform a psychological or psychiatric review and to complete a psychological residual functional capacities assessment.  42 U.S.C. § 421(h); <u>White v. Barnhart</u>, 321 F.Supp. 2d 800, 804 (N.D. W. Va. 2004)(remanding case where the claimant suffered from anxiety disorders and serious symptoms of agoraphobia, had not sought out medical treatment, and the ALJ denied Social Security benefits by finding, without the benefit of a medical opinion, that the claimant could work if he received treatment and medication).

    2.   <u>Weight afforded a VA disability rating</u>.

The ALJ also concluded that the VA's 2001 evaluation and disability rating were based on diagnosis alone and were therefore not of controlling weight in this proceeding.  The VA's 2001 medical evaluation of Franz includes the following diagnostic findings:

> Major depression, continuous. . . .  Global assessment of function for major depression is 50 indicating serious ongoing symptomatology including disabling indecision and ruminations.  The depressive symptomatology is seriously impairing his social activities and have been a significant impediment in his occupational attempts.  He did drop out of school indicating significant dysfunctioning in school. . . . In summary, "[h]is symptomatology has <u>remained constant</u> with significant impairment in social, occupational, and educational functioning related to his depressive symptomatology . . . .  He is living a very restricted and isolated life style.

AR 161-162 (emphasis added).  Accordingly, the VA concluded that Franz' "service connected major depression interferes with his ability to obtain and sustain substantially gainful occupation. . . ."  AR 309-10.

The Eighth Circuit has clearly held that the VA's diagnosis and conclusions merit more than a peripheral reference in the ALJ's decision.

> It is true that "the ALJ does not have to discuss every piece of evidence presented. . . ." Miller v. Shalala, 8 F.3d 611, 613 (8th Cir. 1993).  It is also true that a disability determination by the VA is not binding on an ALJ considering a Social Security applicant's claim for disability benefits.  See Jenkins v. Chater, 76 F.3d 231, 233 (8th Cir. 1996).  We think, however, that the VA finding was important enough to deserve explicit attention.  We agree with other courts that findings of disability by other federal agencies, even though they are not binding on an ALJ, are entitled to some weight and must be considered in the ALJ's decision.  See Wilkins v. Callahan, 127 F.3d 1260, 1262 (10th Cir. 1997); Baca v. Department of Health and Human Services, 5 F.3d 476, 480 (10th Cir. 1993); Fowler v. Califano, 596 F.2d 600, 603 (3d Cir. 1979).

Morrison v. Apfel, 146 F.3d 625, 628 (8th Cir. 1998).  "A passing reference to another agency's disability finding or a perfunctory rejection of it will not suffice." Richter v. Chater, 900 F.Supp. 1531, 1539 (D.Kan. 1995).

The ALJ's decision does discuss Franz' 2001 VA evaluation and rating, but in the context of his decision, it appears the diagnostic opinions set forth in the evaluation were not considered, as they were not discussed.  The ALJ begins by stating "[w]hile the evidence after the Date Last Insured of June 2000 is not relevant for purposes of this Title II claim, it is instructive."  However, the only portions of the 2001 evaluation apparently found "instructive" by the ALJ were those stating what Franz remained able to do, such as play computer games, read, do puzzles, and watch television.  The ALJ comments that Franz began a second degree in computer networking "which he did not complete due to lack of motivation," but the ALJ does not mention that this "lack of motivation" (which the ALJ later also uses to find Franz is not credible) may be part of the "serious ongoing

symptomatology" related to his severe depression which includes "disabling indecision and ruminations."

Although the ALJ mentions the 2001 VA evaluation, he apparently disregarded the context of the statements within that report, selecting for mention and consideration only those portions of the 2001 evaluation which lent support to his ultimate conclusion:  Franz was not disabled as of June 30, 2000. Franz' functional impairments caused by his continuing depression, as diagnosed by the VA and incorporated into its 2001 disability rating, are never mentioned in the ALJ's decision.  If VA findings are "important enough to deserve explicit attention," (Apfel, 146 F.3d at 628), they are certainly entitled to be considered in their totality.  The ALJ's opinion does not show that attention was given to the VA physician's underlying clinical observations and diagnoses.

B.    Franz' Residual Functional Capacity.

Franz argues that the ALJ determined the extent of Franz' mental impairments without supporting objective medical evidence, failed to follow the Polaski standard in evaluating Franz' subjective statements concerning his nonexertional impairments, failed to consider Franz' testimony concerning his mental symptoms, and therefore included improper and unsupported assumptions, or failed to include medically supported impairment findings, when presenting hypothetical questions to the vocational rehabilitation expert.  Though framed as five separate issues in the claimant's brief, Franz is essentially arguing that the ALJ failed to properly assess his residual functional capacity, and accordingly, any opinions based on this improper assessment cannot provide a basis for denying social security benefits.

"The ALJ must assess a claimant's RFC based on all relevant,
credible evidence in the record, 'including the medical records,
observations of treating physicians and others, and an
individual's own description of his limitations.'"  Tucker v.
Barnhart, 363 F.3d 781, 783 (8th Cir. 2004)(quoting McKinney v.
Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).  "Although the ALJ
'bears the primary responsibility for assessing a claimant's
residual functional capacity based on all relevant evidence,'
Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000), . . .
assessing the claimant's residual functional capacity is a
medical question."  Lauer v. Apfel, 245 F.3d 700, 704 (8th
Cir.2001).  "'[S]ome medical evidence," Dykes v. Apfel, 223 F.3d
865, 867 (8th Cir. 2000)(per curiam), must support the
determination of the claimant's RFC, and the ALJ should obtain
medical evidence that addresses the claimant's 'ability to
function in the workplace.'"  Lauer v. Apfel, 245 F.3d at 704
(quoting Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)).
In evaluating a claimant's RFC, the ALJ is not limited to
considering medical evidence, but is required to consider at
least some supporting evidence from a professional.  Masterson v.
Barnhart, 363 F.3d 731, 737-38 (8th Cir. 2004).

     As to Franz' residual functional capacity, the ALJ
concluded:

          I find that the claimant retained the residual capacity
          to perform light work with limited contact with the
          public and occasional supervision.  This results in no
          restriction of activities of daily living, moderate
          difficulties in maintaining social functioning, mild
          difficulties in maintaining concentration, persistence
          or pace and no episodes of decompensation.

AR 23.  In reaching this conclusion, the ALJ disregarded all
medical evidence after the date last insured, finding such
evidence was "not relevant to a disability finding in this case
since no finding could be made on the pre-June 30, 2000
evidence."  The ALJ bears the primary responsibility for

22

assessing a claimant's residual functional capacity based on all relevant evidence.  Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001).  As previously discussed, he failed to do so, requiring remand of this case for proper consideration of the entire relevant record.

Before the ALJ determines an applicant's RFC, "the ALJ must determine the applicant's credibility, as his subjective complaints play a role in assessing his RFC."  Ellis v. Barnhart, 392 F.3d 988, 995-96 (8th Cir. 2005)(citing Pearsall v. Massanari, 274 F.3d. 1211, 1217-19 (8th Cir. 2001)).  "'Where adequately explained and supported, credibility findings are for the ALJ to make.'"  Id. at 996 (quoting Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000).

The ALJ determined that Franz' subjective allegations were not "sufficiently credible to warrant restrictions greater than those established by the objective medical record."  AR 23-24.  The ALJ specifically found that "during the relevant period," Franz was not receiving mental health treatment; he denied panic attacks, stating only that he was more 'comfortable at home;" and he was able to actively pursue a college degree until he quit.  The ALJ found that Franz' subjective complaints were not consistent with his treatment.  As to Franz' physical complaints, the ALJ noted specifically that Franz received only conservative treatment, was not aggressively seeking and receiving medical treatment, and there was no evidence of disuse muscle atrophy compatible with alleged inactivity and inability to function.  He further notes that if Franz were as mentally disabled as he claims, he would have received regular mental health care rather than short-term care and/or assessments every two years, and he would have taken his prescribed medication.  Finally, the ALJ found that Franz' daily activities--including living alone and independently, maintaining his own household, managing his own money, playing computer games, reading, doing puzzles, and

pursuing a degree in computer networking and programming--"are
not the activities of an incapacitated individual."  AR 24.

The ALJ concluded that Franz' "subjective complaints and
alleged limitations are out of proportion to the objective
clinical findings and observed functional restrictions noted" in
the record, his "subjective complaints and alleged limitations
are not consistent with the treatment he received," his "daily
activities are not consistent with total disability," and "these
inconsistencies indicate that the claimant might be attempting to
present himself as more limited than he really is to qualify for
benefits."  AR 24.

To assess a claimant's credibility, the ALJ must consider
all of the evidence, including prior work records and
observations by third parties and doctors regarding daily
activities, the duration, frequency, and intensity of subjective
symptoms, precipitating and aggravating factors, the dosage,
effectiveness, and side effects of medication, and functional
restrictions.  Lowe v. Apfel, 226 F.3d at 971-72 (citing Polaski
v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  The ALJ may not
discount a claimant's complaints solely because they are not
fully supported by the objective medical evidence, but the
complaints may be discounted based on inconsistencies in the
record as a whole.  Id. at 972.  The ALJ is not required to
discuss methodically each Polaski consideration, so long as the
ALJ acknowledges and examines those considerations before
discounting the subjective complaints, (id.(citing Brown
v. Chater, 87 F.3d 963, 966 (8th Cir. 1996)), and makes "express
credibility findings," and "explain[s] the record inconsistencies
that support those findings."  Dolph v. Barnhart, 308 F.3d 876,
879 (8th Cir. 2002)(emphasis added).

As to Franz' physical impairments, his testimony did not
contradict the medical records.  He admitted at the hearing that
his daily pain was, on average, mild.  The record reflects Franz

24

answered every question consistent with the medical records, and
the ALJ's decision includes no specific record citations to the
contrary.  Moreover, a fair reading of the record reflects that
while the ALJ focused the hearing on Franz' physical impairments,
almost to the complete exclusion of any testimony related to
mental health symptoms, Franz' request for Social Security was
based primarily on a mental disorder.

As to the mental health symptoms and impairments, it is
difficult to know what the ALJ was considering when assessing
Franz' credibility.  Except when confronted on the issue by
Franz, the ALJ asked no questions and elicited no testimony from
Franz concerning his mental health symptoms.  Indeed, the ALJ
told Franz that with respect to mental health symptoms, he relies
upon the medical records, not the claimant's testimony, because
he is not a psychiatrist.  To the contrary, Franz' testimony was
relevant, but it was not elicited by the ALJ.

Franz' testimony of record concerning his mental health
conditions was limited to claiming he cannot comfortably leave
his house, and when he leaves, he wants to return home
immediately, sweats profusely, and gets very agitated and angry.
AR 339-40.  These statements are not contradicted by Franz'
psychiatric records, and Franz' statements as found within the
records themselves were relied on, and not challenged by, his
treating psychiatrists in reaching their diagnoses.  Therefore,
the medical records, and the objective diagnoses set forth in
those records, were not inconsistent with Franz' stated
subjective symptoms.  Moreover, if the ALJ did rely on the
mental health records rather than the claimant's testimony as the
source of Franz' subjective complaints, it is difficult to
understand how Franz' statements as reflected in those records
could ever be inconsistent with the records.  The ALJ's decision
does not state that Franz' complaints are inconsistent within the
records; that the Franz' complaints changed from record to record
for no apparent medical reason.  The ALJ's decision does not

"explain the record inconsistencies," (<u>Dolph</u>, 308 F.3d at 879),
supporting his conclusion that Franz' "subjective complaints and
alleged limitations are out of proportion to the objective
clinical findings and observed functional restrictions noted" in
the medical records.  AR 24.

When evaluating a claimant's subjective claims of
limitations, "[t]he ALJ must also consider "observations by third
parties." <u>O'Donnell v. Barnhart</u>, 318 F.3d 811, 816 (8th Cir.
2003)(quoting <u>Jones v. Callahan</u>, 122 F.3d 1148, 1151 (8th Cir.
1997)).  The record in this case included a statement of a friend
who verified that Franz had, in essence, withdrawn from public
life and remained isolated at home, his symptoms beginning as
early as 1996.  The ALJ did not find that this third party's
statements were inconsistent with the plaintiff's testimony.  In
fact, it appears the ALJ completely ignored the third party
statement in assessing Franz' credibility.  When evaluating
chronic mental health disorders, "[t]hird party non-medical
information may be useful in obtaining a better description of
the individual's daily activities, interests, and interpersonal
relationships. . . . [The ALJ] should "consider information
provided by others . . . who have had close contact with the
individual and have knowledge of his or her living conditions."
SSR 83-15.

The ALJ noted that Franz quit college more than once in his
decision.  For the VA treating physicians, this conduct was
considered a result of Franz' depression and indicative of its
severity; for the ALJ, however, quitting college indicated Franz
was not really disabled, the clear implication being that he was
malingering.  The ALJ's decision does not state or imply that he
considered Franz' conduct of dropping out of college in the
context of his underlying diagnosis of major depression, and
associated symptoms of withdrawal and isolation.

Similarly, the ALJ concluded Franz was not credible because he claimed to have severe symptoms of depression and isolation, but did not seek and obtain on-going treatment.  An ALJ may properly consider the claimant's willingness to submit to treatment in determining the sincerity of his alleged subjective symptoms.  <u>Thomas v. Sullivan</u>, 928 F.2d 255, 259 (8th Cir. 1991).  In the context of this case, however, the ALJ's opinion did not assess the entire relevant record to determine whether Franz' underlying mental disorders, and associated isolation and withdrawal, were in fact a cause of Franz' failure to seek or comply with outside treatment options.

Finally, the ALJ's finding that Franz is not incapacitated because he can function at home does not discuss a crucial symptom reflected in the medical records--Franz' mental condition renders him unable to leave home without severe symptoms of anxiety.  As described in Listing 12.00 ¶ F, in the context of chronic mental disorders, "overt symptomatology may be controlled or attenuated by psychosocial factors" such as living in structured settings, which may include the claimant's home.  "Such settings may greatly reduce the mental demands placed" on the claimant, and "overt symptoms and signs of the underlying mental disorder may be minimized."  If "symptomatology is controlled or attenuated by psychosocial factors," the Commissioner "must consider the claimant's ability to function outside of such highly structured settings."  Disability Evaluation Under Social Security (the "Blue Book"), Listing 12.00 (F), SSA Pub. No. 64-039 (January 2003).  Listing 12.06 ¶ C acknowledges the uniqueness of agoraphobia, an anxiety disorder manifested by an overwhelming fear of leaving the home.

In cases of alleged agoraphobia, the act of seclusion itself is the primary issue, because it is the inability to leave the house or to travel without some support, rather than the ability to function on the job, that limits the jobs an individual can be expected to perform.  3 Soc. Sec. Law & Prac. § 42:133, footnote

8 (citing SSA Circular 05-84-OD, (March 27, 1984)). Residual functional capacity "is an assessment of an individual's ability to do sustained work-related physical and mental activities <u>in a work setting</u> on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p (emphasis added).

Moreover, while the ALJ's opinion refers to many homebound activities Franz is able to do, and states these activities prove he his not incapacitated, "the ability to perform sporadic light activities does not mean that the claimant is able to perform full time competitive work." <u>Ross v. Apfel</u>, 218 F.3d 844, 849 (8th Cir. 2000)(holding that the ability to mow the lawn, help to paint his uncle's cabin, drive, watch television, and sit on a fishing boat on "good days," is not inconsistent with testimony that on bad days, the claimant cannot function at all). The Eighth Circuit "has repeatedly stated that a person's ability to engage in personal activities such as cooking, cleaning, and hobbies does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity." <u>Kelley v. Callahan</u>, 133 F.3d 583, 589 (8th Cir. 1998)(citing <u>Hogg v. Shalala</u>, 45 F.3d 276, 278 (8th Cir. 1995).

The record as it existed before the ALJ contains observations of multiple treating VA doctors and presents evidence of complex and interrelated chronic mental health problems. These records indicate that Franz' withdrawal and isolation within his home, to the possible exclusion of going to college or seeking medical treatment, and his ability to function within in the confines of his home but not elsewhere, may be symptoms of his major depression rather than reasons to discount his credibility. On remand, the ALJ must assess the claimant's credibility in the context of the total record, including his underlying mental impairments.

Franz claims the hypothetical question posed to a vocational expert contained functional capacity assumptions not supported by the record, and failed to include other impairments supported by the record.  A hypothetical question posed to a vocational expert "need only include those impairments and limitations found credible by the ALJ." Dukes v. Barnhart, 2006 WL 278133, *5 (8th Cir. February 7, 2006)(quoting Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005)).  However, this axiom presupposes that the ALJ considered the claimant's entire relevant history, and appropriately considered his credibility, when determining whether he is currently disabled.  Cf. Ellis, 392 F.3d at 997 (dissent).  It is not for this court to determine, at this time, whether the ALJ failed to include functional impairments in his hypothetical questions.  The ALJ must first be afforded the opportunity to comply with the requirements set forth in this order and reconsider the issue on remand.

As to those assumptions used by the ALJ at the hearing, the ALJ asked the vocational expert to assume Franz could tolerate public contact for six hours per day, later modifying it to three hours per day.  AR 343, 348.  There is no medical evidence in the record supporting these functional restrictions.  A claimant's residual functional capacity is a medical question.  Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001).

A vocational expert's answers to the hypothetical questions, and specifically those questions assuming Franz can leave his home and work in a public setting for at least three hours, cannot constitute sufficient evidence that Franz is able to engage in substantial gainful employment.  See Lauer v. Apfel, 245 F.3d 700, 706 (8th Cir. 2001).  The hypothetical questions posed by the ALJ must be based upon the correct residual functional capacity, or the expert's response cannot constitute substantial evidence in support of a finding of no disability. See Holmstrom v. Massanari, 270 F.3d 715, 722 (8th Cir. 2001); Newton v. Chater, 92 F.3d 688, 694-95 (8th Cir. 1996).  Since the

29

ALJ's hypothetical questions were based upon an inadequate review of the entire relevant record and an insufficient assessment of Franz' credibility, the ALJ's RFC findings could not be used in formulating valid hypothetical questions.

I note that in response to questioning by Franz' attorney, the vocational expert testified that Franz could be gainfully employed even if limited to one hour of public contact a day. However, she explained that for most of the jobs he could still do, he would have little or no public contact, and his only contact would be with co-workers.  This answer reflects a fundamental misunderstanding of what public contact means in the context of this case.  The medical records establish that as applied to Franz, contact with co-workers is contact with the public.  Upon remand, this contextual definition of "public contact" must be explained when posing hypothetical questions to the vocational expert.

C.   <u>Failure to Obtain a Medical Advisor to Determine the Date of Onset</u>.

It is clear from the ALJ's written decision that he considered medical records generated after the date last insured as irrelevant to proving disability, or worthy of very little weight.  He therefore concluded that the 1999 VA evaluation was the only relevant record, and since, in his opinion, it did not justify a finding of disability, Franz had failed to prove he was disabled as of the date last insured.

As previously discussed, the records following Franz' date last insured were relevant but inadequately examined, considered, and discussed by the ALJ.  It is unknown at this time whether, upon proper examination and inquiry of all relevant evidence, the ALJ will ultimately find that Franz is or has ever been disabled. However, at the very least, Franz' medical records indicate that sometime between the 1999 VA evaluation and 2001 VA evaluation, a

30

medical doctor concluded Franz' mental health deteriorated to
such an extent that he became disabled by VA standards.   AR 310.
Franz' counsel argued that the 2001 VA evaluation should "relate
back" to a time prior to June 30, 2000.

If, on remand, the ALJ concludes Franz is disabled, the
onset date is critical to determining whether he is entitled to
Title II benefits.   Social Security Ruling 83-20 emphasizes the
importance of establishing the disability onset date.   "For
disabilities of traumatic origin, onset is the day of the injury
if the individual is thereafter expected to die as a result or is
expected to be unable to engage in substantial gainful activity .
. . for a continuous period of at least 12 months."   SSR 83-20.
However, where, as in this case, Franz' mental impairment was not
caused by trauma, "the determination of onset involves
consideration of the applicant's allegations, work history, if
any, and the medical and other evidence concerning impairment
severity.   The weight to be given any of the relevant evidence
depends on the individual case."   SSR 83-20.

Precise evidence of the onset date may not always be
available.   As explained in Social Security Ruling 83-20:

> In some cases, it may be possible, based on the medical
> evidence to reasonably infer that the onset of a
> disabling impairment . . . occurred some time prior to
> the date of the first recorded medical examination,
> e.g., the date the claimant stopped working. How long
> the disease may be determined to have existed at a
> disabling level of severity depends on an informed
> judgment of the facts in the particular case. This
> judgment, however, must have a legitimate medical
> basis.  At the hearing, the [ALJ] should call on the
> services of a medical advisor when onset must be
> inferred.  If there is information in the file
> indicating that additional medical evidence concerning
> onset is available, such evidence should be secured
> before inferences are made.
>
> If reasonable inferences about the progression of the
> impairment cannot be made on the basis of the evidence

31

in [the] file and additional relevant medical evidence
is not available, it may be necessary to explore other
sources of documentation.  Information may be obtained
from family members, friends, and former employers to
ascertain why medical evidence is not available for the
pertinent period and to furnish additional evidence
regarding the course of the individual's condition. . .
.  The impact of lay evidence on the decision of onset
will be limited to the degree it is not contrary to
the medical evidence of record. . . .

The available medical evidence should be considered in
view of the nature of the impairment (i.e., what
medical presumptions can reasonably be made about the
course of the condition).  The onset date should be set
on the date when it is most reasonable to conclude from
the evidence that the impairment was sufficiently
severe to prevent the individual from engaging in
[gainful activity] for a continuous period of at least
12 months . . . .  Convincing rationale must be given
for the date selected.

SSR 83-20.  The Eighth Circuit, quoting and relying on a large
portion of this language, has held that when the medical evidence
of onset is ambiguous, an ALJ is required to call upon a medical
advisor to ensure that the onset date is based upon a "legitimate
medical basis.  Grebenick v. Chater, 121 F.3d 1193, 1200-01 (8th
Cir. 1997).

     If the ALJ, upon proper examination of the all the relevant
evidence, concludes Franz' mental impairments are disabling, the
onset date becomes a critical issue to his recovery of Social
Security benefits, and since Franz' condition deteriorated
between 1999 and 2001, an ambiguity would then exist concerning
the actual onset date of that disability.  The ambiguity as to
onset date cannot be resolved by the medical evidence currently
in his file because there is no evidence concerning the
plaintiff's psychological functioning between the 1999 and 2001
VA evaluations.  If the ALJ concludes that Franz is disabled for
Social Security purposes, the ALJ must call upon the assistance
of a medical advisor to help him determine an onset date with a
legitimate medical basis.  If the medical advisor is unable to
offer evidence concerning the progression of the plaintiff's

impairment, the ALJ can then seek additional lay evidence to
attempt to document this progression and infer the onset date.
SSR 83-20.

## V.   CONCLUSION

I conclude the Commissioner's decision to deny benefits is
not supported by substantial evidence on the record as a whole
because the ALJ failed to properly consider all relevant evidence
in the record, including the 2001 disability evaluation and
rating of the Veterans Administration; failed to properly elicit
and assess Franz' testimony regarding his alleged disabilities;
failed to properly evaluate Franz' RFC; and presented
hypothetical questions to the vocational expert which included
assumptions unsupported by the medical record.  On remand the ALJ
should reevaluate Franz' RFC in accordance with this opinion, and
assuming testimony is again solicited from a vocational expert,
conform any hypothetical questions to the new RFC determination,
and determine, as necessary, the date of onset of any disability
found.

On remand it is recommended that the matter be assigned to a
different ALJ.  Franz was entitled to be heard, to receive a full
hearing, and perhaps more importantly in the context of this
case, to receive an impartial and fair hearing.  Due process
requires "that a claimant receive meaningful notice and an
opportunity to be heard before his claim for disability benefits
can be denied.  Stoner v. Secretary of Health and Human Services,
837 F.2d 759, 760 (6th Cir. 1988).  A reading of only the cold
record of Franz' hearing before the ALJ could support an
inference of overt partiality on the part of the ALJ.  Assigning
a different ALJ would remove the grounds for such an inference.

Accordingly,

IT IS ORDERED that judgment shall be entered by separate
document, providing that the Commissioner's decision is reversed
and the cause remanded for further proceedings pursuant to the
fourth sentence of 42 U.S.C. § 405(g).

DATED this 16th day of February, 2006.

s/ David L. Piester
David L. Piester
United States Magistrate Judge